Thomas **JOHNSON**, Appellant,

v.

Milton **WEINBERG**, et al., **Appellees.**

No. 80–251.

District of Columbia Court of Appeals.

Reargued May 18, 1981.*

Decided July 28, 1981.

■

---

* This case was initially argued on December 18, 1980 and an opinion rendered on March 3, 1981. We granted a petition for rehearing and, subsequent to reargument, modified the opinion as appears herein.

Harold A. Sakayan, Washington, D. C., with whom Gerald I. Holtz, Washington, D. C., was on the response to the petition for rehearing, for appellant.

Raymond L. Poston, Jr., Washington, D. C., filed the petition for rehearing, for appellees.

Before KELLY, FERREN, and PRYOR, Associate Judges.

PRYOR, Associate Judge:

Appellant, Thomas Johnson, brought suit to recover from appellees, Milton and Leanor Weinberg,[1] for injuries sustained when he was shot by a person alleged to be an employee of the Weinbergs while appellant was a patron at their laundromat. After extensive pretrial discovery, appellees moved for summary judgment. The court found there was no evidence that Leanor owned or operated the laundromat and thus granted the motion with respect to her, but denied it as to her husband, Milton. The claim against Milton proceeded to trial and at the close of appellant's case, the court directed a verdict in favor of Milton Weinberg, holding that the employee's actions were outside of the scope of his employment. Appellant contends here that the trial court erred in granting the motion for summary judgment, as the pleadings, depositions, interrogatories, admissions and other pretrial information of record, raise a genuine issue as to whether Leanor Weinberg is a joint owner of the laundromat. Additionally, appellant cites as error the granting of the directed verdict in favor of Milton Weinberg. Upon consideration of the questions, we affirm as to the former and reverse as to the latter.

I

The facts which precipitated this action are materially undisputed. On January 28, 1975, appellant visited a laundromat near his home at midday to launder some shirts. When he arrived, he observed Ezeal Boyd working in the laundromat, as had been the case on all previous occasions when he had used this laundromat. Boyd performed general cleaning duties at the laundromat and, on occasions when all machines were full, would empty them when the wash was completed, so that they would be available for other patrons. Appellant had no discussion with Boyd at that time; he simply deposited his shirts into a machine and returned to his nearby home.

When he returned for his shirts less than an hour later they were missing. He questioned Boyd about the shirts. Boyd responded that he didn't know their whereabouts. Appellant then left the laundromat and returned to his unattended minor son at home, where he remained until a woman friend arrived at approximately 4:45 p. m. to assist him in caring for the child. Accompanied by a male friend, Johnson made another trip to the laundromat in further search of his shirts. Still unable to get a satisfactory response from Boyd, Johnson attempted, in vain, to find the person whom he knew to be the manager of the business, Ms. Anna Schneider. Boyd suggested that Schneider would probably be there at about 6:30 that evening in order to close the premises.

At the time indicated, appellant again appeared at the laundromat, Ms. Schneider was not there as Boyd had anticipated; however, Boyd was still present. Appellant and Boyd had further discussion about the shirts which culminated in appellant saying, "forget it" and turning to leave. As he walked toward the door, he heard Boyd call out. He turned and was shot in the face by Boyd.

1. Also named as a defendant was Ezeal Boyd, the employee who shot Johnson. Service was never obtained on Mr. Boyd. Group Health Association, Inc. was permitted to intervene in the proceedings to assert its subrogation claim for expenses incurred in the treatment of Mr. Johnson for the injuries he sustained when shot. The appeal of Group Health Association, Inc. was dismissed by order of this court dated July 22, 1980, on the grounds that its notice of appeal was untimely filed. We are concerned here solely with Johnson's claim against the Weinbergs.

## II

Summary judgment is, of course, an extreme remedy and should only be granted where the record, at the time ·of the motion, reveals no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Maddox v. Bano*, D.C.App., 422 A.2d 763 (1980);· *Turner v. American Motors General Corp.*, D.C.App., 392 A.2d 1005, 1006 (1978); *Doolin v. Environmental Power LTD*, D.C.App., 360 A.2d 493 (1976). While the proponent of the motion must shoulder the burden of proof, the opposing party is entitled to all favorable inferences which can be drawn from the evidence. *Maddox, supra; Turner, supra; Harrison v. May Department Stores Co., Inc.*, D.C.App., 381 A.2d 610 (1977).

Thus, the narrow question for our review is whether, at the time of the hearing, there was sufficient evidence of record to permit a jury to consider the issue of implied partnership. This matter has not been adjudicated in the District of Columbia in a similar factual setting. We note, however, that in *Cooper v. Spencer*, 218 Va. 541, 238· S.E.2d 805 (1977) the joint ownership of a farm utilized for commercial purposes by a man and woman who may have shared gross returns,[2] was held not to create a partnership. A similar result was reached in *Anderson v. Anderson*, 54 Wis.2d 666, 196 N.W.2d 727 (1972).

In this instance, in order to establish an implied partnership between Leanor and Milton Weinberg, appellant is compelled to rely solely on the joint ownership of the property which houses the laundromat. The tax returns of record do not purport to report the income of a partnership. To the contrary, it is reported that the business is a sole proprietorship. *See Adams v. United States*, 328 F.Supp. 228, 232 (D.Neb.1971).

In his complaint, appellant asserted that Milton and Leanor jointly owned and operated the commercial premises on which the shooting occurred. Appellees admitted that Milton owned the laundromat, but denied that Leanor had any interest therein. In response to interrogatories, the Weinbergs admitted that the building in which the laundromat is located is jointly owned by them.

On the other hand, Milton Weinberg is the sole signatory (as purchaser) of the contract for sale of the premises. He renovated the building without the participation of Leanor and was the sole applicant for the occupancy permit for the laundromat and two apartments located in the building. The license to run the laundromat is solely in Milton's name, and he alone is responsible for keeping the books and overseeing the management of the property. Finally, appellees' tax returns, though jointly filed, indicate that the business is being operated as a sole proprietorship. Given these circumstances, we think the court committed no error in concluding that Mrs. Weinberg was entitled to a judgment as a matter of law.

## III

Appellant's primary contention is that the court erred in directing a verdict against him at the close of his evidence. We agree.

A directed verdict is only appropriate where the probative facts are undisputed and where reasonable minds can draw but one inference from them. *Mills v. Cosmopolitan Insurance Agency, Inc.*, D.C.App., 424 A.2d 43, 45–46 (1980). When applying this standard, all evidence must be viewed in the light most favorable to the party against whom the motion is made. *Id.; Corley v. BP Oil Corp.*, D.C.App., 402 A.2d 1258 (1979): "With the evidence so viewed, a verdict may be directed only when the evidence is so clear that reasonable men could reach but one conclusion. *Bauman v. Sragow*, D.C.App., 308 A.2d 243, 244 (1973). If there is room for a difference of opinion, the wise course is for the trial judge to allow the case to go to the jury . . . ." *Id.* at 1263, citing *Seganish v. District of Columbia Safeway Stores, Inc.*,

2. *See* D.C.Code 1973, § 41–306.

132 U.S.App.D.C. 117, 122, 406 F.2d 653, 658 (1968); *Mills v. Cosmopolitan Insurance Agency, Inc., supra* at 46; *Lee v. Fisco Enterprises, Inc., of Washington, D. C.*, D.C. App., 233 A.2d 44 (1967).

To prevail in his claim against appellees, appellant had the burden of proving that there was a master/servant relationship between the Weinbergs and Boyd, and that Boyd's action was within the scope of his employment. *See Penn Central Transportation Co. v. Reddick*, D.C.App., 398 A.2d 27, 29 (1979). The trial court concluded that there was a master/servant relationship, but held as a matter of law, on the evidence adduced, no reasonable mind could conclude that when the shooting occurred, Boyd was acting within the scope of his employment. The principal question for this court, therefore, is whether the evidence discloses any basis upon which a juror could find that the shooting did occur within the scope of Boyd's employment.

Section 228 of the Restatement (Second) of Agency (1957), provides a general definition of "scope of employment":

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Section 245 refers specifically to instances where the agent uses force and provides:

A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpected in view of the duties of the servant.

Thus in determining whether an assault occurred within the scope of employment, we look at the nature of the employee's job, whether the assault occurred while the employee was furthering his employer's business, whether the act was personal in nature and wholly unrelated to the employment relationships, and whether the act was totally unprovoked and unexpected.

Applying these criteria to a case in which a railroad brakeman seeking transportation from the train station, assaulted a taxicab driver, this court found, as a matter of law, that the employee "was in no sense, either wholly or partially [acting] in furtherance of . . . [the railroad's] business." *Penn Central Transportation Company v. Reddick, supra* at 32. We there found that the assault was to accomplish an independent and malicious end and therefore out of the scope of the employment relationship. In the case *sub judice*, the trial court primarily relied on that decision, and we think, misapplied the principles stated therein.

It is true that an employer will not be deemed liable for the intentional torts of an employee which are committed solely in furtherance of the latter's own interests, and not those of the employer. However, in viewing this narrower question—an employee's intentional tort—it is equally clear that where a tort is the outgrowth of a job-related controversy, "then the employer remains liable, since the master and servant relationship is not broken." *Id.* at 30; *see International Distributing Corp. v. American District Telegraph Co.*, 186 U.S.App.D.C. 305, 308, 569 F.2d 136, 139 (1977). *See also Lyon v. Carey*, 174 U.S. App.D.C. 422, 424, 533 F.2d 649, 651 (1976). The critical question to be resolved is whether the conduct in question was foreseeable as being within the range of responsibilities entrusted to the employee. Stated another way, and using the language of the Restatement (Second) of Agency, *supra*, whether "the act was not unexpectable in view of the duties of the servant."

In this case, Boyd was employed to clean the laundromat. In addition to his

regular duties, in the interest of his employer, when all of the washing machines were full he would remove clothes from the machines as they finished washing, so that empty machines would be available for other patrons. This service enhanced customer relations, but also placed Boyd in a position where it would be anticipated that problems of the nature described here could arise.[3] If a patron was unable to locate his or her laundry, once having deposited it, it seems likely that Boyd would be confronted in an effort to resolve the matter. "Whether the assault ... was the outgrowth of a job-related controversy or simply a personal adventure of ... [Boyd's], was a question for the jury." *Lyon v. Carey, supra* at 424, 533 F.2d at 651. There is certainly evidence from which a reasonable person could find that the shooting was the outgrowth of a job-related controversy: Boyd had no previous relations with Johnson which would indicate that the tort was personal; Johnson approached Boyd about a matter relating to the business (his missing shirts). After several futile attempts to locate his shirts, and further discussion with Boyd about the missing shirts, Boyd shot Johnson as he attempted to bring the conversation to a close and leave the premises. No subject unrelated to the missing shirts was ever made a part of the conversation between the men. The assault arose out of the transaction which initially brought Johnson to the premises (to launder shirts) and was triggered by a dispute over the conduct of the employer's business (missing shirts).[4]

Reasonable minds could find that the shooting arose out of and was related to Boyd's employment. *See Lyon v. Carey, supra.* Accordingly, it was a question of fact for the jury, rather than a question of law for the court, and the court committed error by taking the question from the jury.

*Affirmed in part and reversed in part.*

3. The precise occurrence or event need not be foreseeable. *Lyon v. Carey, supra.*

4. The case presents a decidedly different question from *Penn Central, supra* at 32, where we said: "There is nothing in the business of running a railroad that makes it likely that an assault will occur between a railroad brakeman and a taxicab driver over the celerity with which the latter will provide a taxicab ride to the former."